## CHARLESTON.

CLAUDE S. BOGGESS *v.* MONONGAHELA WEST PENN PUBLIC SERVICE COMPANY, *A Corporation*

(No. 6332)

Submitted March 5, 1929. Decided March 12, 1929.

*Ernest R. Bell* and *James A. Meredith,* for plaintiff in error.

*Henry S. Lively,* for defendant in error.

MAXWELL, JUDGE:

In this action the plaintiff recovered a verdict and judgment of $1,000.00 against the defendant for damage to his

automobile and injuries to his wife, whereby he was deprived of her services, on account of the alleged negligent operation of defendant's trolley car at a grade crossing. The defendant brings error. The declaration predicates negligence of the defendant on the grounds of (a) failure of the motorman to give proper warning, and (b) excessive speed of the trolley. The defendant denies that it was negligent and urges that there would have been no accident but for negligence on the part of the plaintiff and his wife in their approach to the crossing, and after they reached the crossing.

On the 12th of August, 1926, a bright and dry day, shortly after seven o'clock A. M., plaintiff's wife was conveying her husband and two other men from Fairmont to their work at Smithtown, a village about seven miles from Fairmont. They were in plaintiff's Hudson coach with windows and windshield open. They left Morgantown Avenue and turned into what is known as the "Drive", which the defendant's car line crosses at about right angles at a point called "Knob Hill Crossing", within the corporate limits of the city of Fairmont. Both plaintiff and his wife were familiar with the crossing, having passed there on the two preceding mornings. Due to the fact that upon the morning last preceding while plaintiff was driving, a collision between plaintiff's automobile and defendant's trolley which came from plaintiff's left had been narrowly averted at this crossing, plaintiff, as they approached the crossing on the morning of the accident, cautioned his wife to drive carefully, and she replied that she would. Accordingly at a distance of about one hundred and twenty-five feet from the crossing, she shifted into second gear and proceeded at the rate of four or five miles per hour.

The crossing itself may be aptly termed "blind". On the left three piles of cross ties and the abutment of a railroad bridge materially obstructed the view, while on the right a hill or embankment some 62 feet from the crossing prevented a clear view of the track in that direction. Elaborate testimony as to the distances one could see along the track to the right from given points on the road is in the record. The plaintiff testifies that at a point 45 feet from the center of

the crossing the view is open for 120 feet to the right of the crossing; at 20 feet there is a view to the right for about 150 feet; and at 10 feet the view is open for about 175 feet. An engineer for the defendant testifies that from a point in the "Drive" 100 feet from the crossing the open view extends to the right for 80 feet; from 46 feet away the view is 100 feet; from 22 feet the view is 200; from 15 feet the view is 500.

All in the car testify to looking both to the right and to the left. Evidence tends to show that they paid more attention to the left, due, no doubt, to the experience of the preceding morning, as well as to the obstructions to the view caused by the piles of cross ties and the railroad bridge abutment. Yet they all distinctly state that they looked to the right several times. Despite their caution the front wheels of the automobile had reached the first rail of the track before any of the occupants saw the defendant's trolley coming from the right. Plaintiff testifies the trolley was 75 feet away and coming 30 miles per hour when he first saw it. Plaintiff's wife testifies it was 100 feet away and coming 30 miles per hour. William Hobaugh, sitting on the left of the rear seat, saw the car when it was 25 feet away and says the speed was 25 or 30 miles per hour. Charles H. Ice, the other passenger, testifies the speed was 25 or 30 miles per hour. None heard a bell or other warning.

Plaintiff's wife immediately stopped the automobile and attempted to shift it into reverse gear and back it off the track. She testifies that had she gone forward she feared the automobile would have been struck mid-side and the occupants killed. Her action, however, was too late to prevent the trolley from striking the automobile on the right front side and dragging it 20 to 30 feet down the track.

The motorman on the trolley testifies that he sounded the bell at a distance of about 165 feet from the crossing, the usual crossing signal; that he then made a gradual application of air and reduced the speed of the car to 18 or 20 miles an hour, and then, at about 80 feet from the crossing he first saw the automobile, slowly approaching the crossing at a distance of 25 or 30 feet therefrom; that he then made a full

application of air and again rang the bell; that the trolley entered the crossing at about an eight mile rate and came to a stop about 20 feet beyond the point of contact before it had entirely cleared the crossing.

He is not corroborated by the sole passenger on the trolley, Miss Deering, who was sitting at the left front of the car, just to the rear of the motorman. She says her attention was first attracted by the ringing of the bell and the application of the brakes on the trolley car; that she immediately looked up and saw the automobile approaching the crossing; that the motorman had given no prior signal for the crossing; that the speed of the trolley at the instant her attention was attracted was at a rate of between 20 and 25 miles per hour. Her testimony as to the distance of the automobile from the crossing when she first looked up is not clear. It is confusing as to whether she meant to fix the distance at 2 feet or 10 feet.

Hobaugh testifies that after the collision the motorman told him the speed of the trolley was about 25 miles per hour when it struck the plaintiff's automobile, which evidence was not denied by the motorman though he gave testimony at length.

Considering the rates of speed of the two vehicles, respectively, the motorman must be mistaken in his opinion that the automobile was 25 or 30 feet from the crossing when he first saw it. The trolley was then about 80 feet from the crossing according to his estimate. The speed of the trolley was somewhere between 18 miles per hour (the lowest estimate given by the motorman) and 30 miles per hour (the maximum rate fixed by occupants of the automobile). There is no denial that the automobile was moving in second gear, very slowly—about 5 miles per hour, or 7 1/3 feet per second. Let us take the approximately mesne figure of 25 miles per hour, which is the rate at which Hobaugh testifies the motorman told him the car was running. At that rate it was running 36 2/3 feet per second. It would have reached the crossing in about 2 1/10 seconds. The automobile would have required about 3 4/10 seconds to run 25 feet. The trolley would thus have reached the crossing first and in such situation the automobile would have struck the trolley and

would not have been struck by it, as actually happened. The testimony of the motorman that the trolley entered the crossing at an eight mile rate must be subjected to most careful scrutiny in the light of the fact that the automobile was knocked or dragged 20 to 30 feet from the point of impact.

On the two issues of fact raised by the declaration, namely, signals and speed, the evidence is conflicting. The motorman says he gave a proper signal about 165 feet away. His passenger says he did not, and the four persons in the automobile all say they heard no such signal though their automobile was open and they were listening. As to the speed there is equal conflict as already noted. Thus we have a jury question unless the facts of the case are such as clearly to establish plaintiff's negligence as a matter of law. "Where the facts which control are not disputed and are such that reasonable minds can draw but one conclusion from them, the question of contributory negligence barring recovery is one of law for the court." *Krodel* v. *Railroad Co.*, 99 W. Va. 374, syl. 5. There are other recent similar cases: *Robertson* v. *Power & Ry. Co.*, 99 W. Va. 356; *Gray* v. *Ry. Co.*, 99 W. Va. 575; *Jameson* v. *Ry. Co.*, 97 W. Va. 119; *Cavendish* v. *Ry. Co.*, 95 W. Va. 490; *Robinson* v. *Ry. Co.*, 90 W. Va. 411. The controlling element in all of those cases was the evident and palpable lack of proper caution on the part of the injured parties before entering upon the railroad crossing. Whenever, as in each of the cases just cited, the controlling facts are such that but one conclusion can be reasonably deducted therefrom, the question of contributory negligence is one of law for the court and not one of fact for the jury. A traveler approaching a railroad crossing at grade may not be wholly indifferent to the means of self-preservation which are at his command and then, following an accident, be permitted to raise an isisue of fact as to whether he was guilty of contributory negligence. The law itself speaks in such instances, and it is the duty of the courts to apply the law.

In the case at bar, in addition to the facts already recited, there is the fact that on the date of the accident there was in existence an ordinance of the city of Fairmont limiting the speed of street cars to 15 miles per hour at crossings in non-

congested districts of the city. This accident occurred in a non-congested or suburban district. The plaintiff and the other persons in his automobile the morning of the accident had the right to assume as they approached the crossing that if a trolley car should come along at that time, it would not be running at a speed in excess of the maximum fixed by the ordinance for such crossing. *Krodel* v. *Railroad, supra,* at page 379, and citations there noted. Also, they had the right to assume that sufficient or proper alarms or signals of the approach of the trolley would be given. The driver of the automobile was not required to stop unless she could not otherwise hear or see the approaching trolley car. In this jurisdiction we do not adhere to the strictness of the so-called Pennsylvania rule which requires a traveler in approaching a crossing to stop, look and listen. *City of Elkins* v. *Ry. Co.,* 76 W. Va. 733, 735; *Robinson* v. *Ry. Co., supra,* at page 416. He must use reasonable care for his safety, that is, look and listen, and if necessary, stop. It is in evidence that the motor of the automobile in which the plaintiff and the three other persons were riding was running smoothly and making very little noise. Under the circumstances it was not encumbent upon the driver of the automobile to stop the same in the approach to the crossing. They all testify that they were watching and listening, though, as already noted, they were paying more attention to the left than to the right. But they were in no sense ignoring the right side. They were not heedless of their danger nor indifferent to the means at their command to protect themselves from injury or death. In our judgment they were therefore not within the rule of *Krodel* v. *Railroad Co., supra,* and other similar cases. The car came on them suddenly. And then, there were the piles of cross ties. Though they were not the property of the defendant, they were partly on its right of way and one of the piles was ten or eleven ties high. This situation required special attention to the left by persons approaching the crossing from the Fairmont side. The defendant was responsible for allowing this condition to obtain, and it cannot now consistently complain that the plaintiff and his companions were giving more attention to the left than to the right as they

approached the crossing. It was a question proper for jury determination as to whether either the plaintiff or his wife was guilty of negligence which contributed to the accident. In our judgment the evidence warranted the finding that the plaintiff and his wife were not negligent, and that the accident would not have happened but for the negligence of the operator of the trolley car in driving the same at excessive speed, and for failure to give timely and sufficient warning of the approach of the car. The law does not require of persons about to enter upon a railroad crossing at grade the highest possible degree of care, but it does require ordinary and reasonable care; *Abernathy* v. *Ry. Co.*, 121 Va. 173; *Jameson* v. *Ry. Co.*, *supra;* that is, "such care and prudence as would be exercised by a man of ordinary prudence under like circumstances." 33 Cyc. 981. The degree of care must of course be in proportion to the extent of the danger at the particular crossing. Idem, p. 982; as the danger increases he must employ more vigilance. *Cavendish* v. *Ry. Co.*, *supra.* And if there be an issue of fact or if different deductions may be made by different people under the facts proved, then the matter of contributory negligence is a question for determination by the jury. *Coleman* v. *Ry. Co.*, 100 W. Va. 679; *Kelly* v. *Ry. Co.*, 99 W. Va. 568. In each of those two cases a verdict against the railroad company was upheld. The facts in the *Coleman* case are strangely similar to the facts in the case at bar.

Although the doctrine of the last clear chance is invoked by the plaintiff to bring him relief if he were found to be negligent, we think that no recovery herein could be predicated thereon, because it is reasonably clear from the evidence that after the peril of the automobile and its passengers came to the knowledge of the motorman, he did everything within his power to avoid the accident. *McLeod* v. *Laundry Co.*, 106 W. Va. 361, 145 S. E. 756.

While the point is made that the court erred in giving to the jury the five several instructions offered by the plaintiff, this is not urged on brief nor in oral argument, and our examination of the plaintiff's instructions does not disclose any prejudicial error therein. The defendant does, however,

rely on the point that there was error in the refusal of the court to give defendant's instructions Nos. 1, 1-A, 4, 12 and 17. Number 1 was a peremptory instruction to find for the defendant and the same was properly refused. Number 1-A was properly refused because it would have eliminated from jury consideration any damages to the plaintiff because of loss of comfort, benefit and assistance of his wife to him because of her personal injury in the accident. Number 4 was properly refused because, although it refers to the conduct of the plaintiff's wife at the time of the accident as having been done upon the basis of "calculation of chances", it was in effect an instruction on contributory negligence, and that matter was covered in other instructions given on behalf of the defendant. Number 12 was properly refused because it embodied the idea that the plaintiff's automobile stopped on the crossing through inadvertence of the driver of the automobile, or her inability to operate and control the same. There was no evidence to support this proposition. The evidence is that she stopped the car deliberately in an effort to back it off the track. Instruction number 17 dealt with the duty devolving upon the plaintiff to use his sense of sight as the automobile approached the crossing and not depend upon his wife. The substance of this instruction was embodied in two or three other instructions that were given to the jury on the request of the defendant.

We see no prejudicial error in the trial of this case. We would not be warranted in saying, as a matter of law, that the plaintiff under the circumstances of the case was guilty of negligence which contributed to the accident. The case clearly involved questions proper for jury determination, and we are of opinion that the evidence was amply sufficient to sustain the verdict which the jury rendered. We therefore affirm the judgment.

*Affirmed.*